UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

LEO JOSEPH GOVONI and
JOHN LEO WITECK

CASE NO. 8:25-cr-00299-WFJ-NHA

18 U.S.C. § 1349
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1344
18 U.S.C. § 1956(h)
18 U.S.C. § 1957
18 U.S.C. § 152(3)

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**
**(Conspiracy to Commit Mail Fraud and Wire Fraud)**

At times material to this Indictment:

**A. Introduction**

1.    From at least June 1, 2009, through May 2025, defendants LEO

JOSEPH GOVONI and JOHN LEO WITECK, as well as others known and

unknown to the Grand Jury, conspired to defraud hundreds, if not thousands, of

victims—many of whom suffered from physical or mental disabilities—out of more

than $100 million. The conspiracy, which connected dozens of interrelated entities

controlled by GOVONI and co-conspirators, victimized vulnerable people

nationwide, including within the Middle District of Florida, where the conspiracy

was based. Through complex financial transactions and deceit, the defendants and

their co-conspirators solicited, stole, and misappropriated client-beneficiary funds—

which they used as a slush fund to enrich themselves and others—and concealed their illegal activities.

## B. Background

2.     Medicaid was a joint federal and state government program that provided free or low-cost health coverage, as well as other items and services, to eligible persons, including low-income individuals, children, and people with disabilities. To qualify for Medicaid, a person's or family's income had to be below a designated threshold, which varied by state.

3.     Supplemental Security Income ("SSI") was a government program that provided monthly payments to people who were age 65 or older, disabled, or blind, and who had little or no income or resources.

4.     People with disabilities caused by accidents and medical malpractice often relied on Medicaid and SSI to pay medical and living expenses. Such persons sometimes received court awards for damages, settlements in personal injury lawsuits, payments from government programs, or insurance payments, all of which were intended to compensate them for their disabilities and injuries.

5.     The law, 42 U.S.C. § 1396p ("Section 1396p"), allowed these people to remain financially eligible for government assistance by permitting these Medicaid and SSI beneficiaries to place financial assets in irrevocable trusts, which were called "special needs trusts" ("SNTs"). Any assets placed in SNTs would not affect their financial eligibility for benefits.

6.    SNT beneficiaries (*i.e.* the Medicaid and/or SSI recipients who contributed assets to them) could use SNT funds to supplement their government assistance benefits and pay for certain expenses—such as medical care, housing, and specialized needs—with the approval of the SNT trustee/administrator.

7.    While individuals or third parties could establish, fund, and administer SNTs, some non-profit associations provided those services for client-beneficiaries.

8.    Section 1396p expressly permitted non-profits administering SNTs to pool assets—*i.e.,* combine the assets of multiple SNT beneficiaries—for investment purposes. The statute required, however, that SNT administrators maintain separate beneficiary accounts and distribute each SNT beneficiary's assets solely for the benefit of that person until the person's death.

9.    In 2000, GOVONI and Individual-1, both residents of Pinellas County, Florida, founded The Center for Special Needs Trust Administration, Inc. ("CSNT") as a 501(c)(3) non-profit Florida corporation located in St. Petersburg, Florida (Pinellas County), which is within the Middle District of Florida. CSNT was in the business of managing SNTs and other trust accounts.

10.    CSNT promoted to prospective client-beneficiaries and representatives, often through their attorneys, that it provided comprehensive trust services related to the formation and administration of SNTs and other trust accounts. CSNT primarily administered SNTs for beneficiaries with physical or

mental disabilities. In short, CSNT's stated purpose was to provide the structures and services authorized by Section 1396p, as detailed above.

11.     CSNT's client-beneficiaries primarily consisted of people receiving Medicaid and/or SSI. Typically, those client-beneficiaries or their legal representatives contracted with CSNT after receiving court awards for damages and/or settlements or recoveries from personal injury lawsuits, established trusts, and deposited those funds with CSNT. Client-beneficiaries could then receive SNT distributions without affecting their eligibility for means-tested public assistance benefits like Medicaid and SSI.

12.     Rather than passively hold individual client-beneficiary trust funds, CSNT purported to actively invest that money, pooling trust funds to do so with supposedly greater efficiency. Each client-beneficiary within a pooled fund had a separate individual account at CSNT, and CSNT purported to track each account's performance and balance separately. In addition, CSNT purportedly distributed investment fees and costs proportionately among all pooled beneficiaries. At least, this is what CSNT claimed in its recruitment communications and in annual statements sent to client-beneficiaries.

13.     GOVONI and Individual-1 served as CSNT officers and members of its board of directors until mid-2009, when GOVONI nominally resigned from CSNT to run another corporation he founded, Boston Finance Group, LLC ("BFG"), and Individual-1 resigned and moved into a legal advisor role. In reality,

4

however, GOVONI continued to control CSNT's operations, finances, and employees until at least early 2022. GOVONI acted in part through oral directives and in part through Individual-1 and other CSNT board members, who were GOVONI's friends and/or associates.

14.    Since its founding in 2000, CSNT grew to be one of the largest administrators of SNTs in the country, with client-beneficiaries located in almost every state, including in the Middle District of Florida, as well as internationally. Between 2009 and 2024, CSNT managed funds for more than 5,000 distinct client-beneficiaries.

15.    As of February 2024, CSNT managed over 2,100 SNTs containing approximately $200 million, through both individual and pooled trusts. CSNT outsourced the investment management of these funds, primarily to Boston Asset Management, Inc. ("BAM"), another entity founded by GOVONI.

16.    On or about February 9, 2024, CSNT filed for bankruptcy in the Middle District of Florida. In the bankruptcy petition, CSNT disclosed that more than $100 million in SNT client-beneficiary funds was missing from trust accounts. The U.S. Bankruptcy Court appointed a bankruptcy trustee to assume control of CSNT during the bankruptcy proceedings.

17.    As part of the bankruptcy proceedings, GOVONI made written and oral statements under oath and penalty of perjury.

18.    The defendants, their co-conspirators, and others known and unknown to the Grand Jury used the abbreviations "PR Funding" to refer to money used to pay wages or payroll ("PR") and used the abbreviation "AP Funding" to refer to money used to pay accounts payable ("AP") or other debts or costs in notations on checks and/or other financial recordkeeping documents.

## C. Relevant Financial Institutions

19.    Financial Institution-1 was a federally chartered financial institution headquartered in Texas, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

20.    Financial Institution-2 was a federally chartered financial institution headquartered in Arkansas, whose deposits were insured by the FDIC.

21.    Financial Institution-3 was a federally chartered financial institution headquartered in California, whose deposits were insured by the FDIC.

22.    Financial Institution-4 was a federally chartered financial institution headquartered in Alabama, whose deposits were insured by the FDIC.

## D. Other Involved Corporate Entities Controlled by GOVONI

23.    The conspiracy involved dozens of corporate entities founded and/or controlled by GOVONI and co-conspirators, including, most prominently, the following Florida corporations:

a.    *Boston Asset Management, Inc.* ("BAM") was a for-profit investment advisory firm. According to its public disclosure brochures, BAM's

clients were primarily trustees administering SNTs and pooled trusts, like those at
CSNT. In 2024, BAM claimed to have one client: CSNT. GOVONI served as
BAM's Chief Executive Officer ("CEO") and majority owner from its 1992
founding through the date of this Indictment. In this conspiracy, BAM managed
some assets and investments for CSNT and its client-beneficiaries legitimately
while also serving as a vehicle for GOVONI and others to misappropriate CSNT
funds (*i.e.,* beneficiaries' pooled trust assets) for their own enrichment.

      b.    *Boston Finance Group, LLC* ("BFG") was a for-profit financial
services company that loaned money to other businesses, including law firms.
GOVONI established BFG in 2008, while he was a Director of CSNT, and from
2008 to 2024, GOVONI served as CEO and Managing Member of BFG. As part of
the fraud and money laundering conspiracies, BFG functioned as a slush fund and
pass-through entity. BFG received approximately $100 million from CSNT via
"loans" to BFG that co-conspirators described as "investments." In reality,
however, BFG did not invest the overwhelming majority of that money in any way
that would benefit CSNT client-beneficiaries as their trusted fiduciary, but rather
distributed the money to other GOVONI-controlled entities for illegitimate, non-
investment purposes, including the personal enrichment of the defendants and
others.

      c.    *Austin Colby Co.* ("Austin Colby") was an administrative
services company founded and largely operated by GOVONI that handled human

resources and information technology functions for CSNT from at least 2009 until April 2022. Austin Colby controlled CSNT's human resources data, payroll account data, payroll processing, and electronic systems and records. Austin Colby provided similar services for BAM, BFG, and other GOVONI-controlled entities. Austin Colby was the largest single recipient of CSNT funds (approximately $31 million, distributed to it via BFG), which Austin Colby used to pay overhead and operating costs, including but not limited to wages for GOVONI and for Austin Colby employees unconnected to CSNT and other payments that were not investments for the benefit of CSNT client-beneficiaries. As such, Austin Colby functioned in part as a vehicle for GOVONI to enrich himself and others at the expense of CSNT client-beneficiaries. In January 2014, WITECK was hired as an Austin Colby employee.

      d.     *Fiduciary Tax & Accounting Services, LLC* ("FTAS") was a for-profit financial services firm co-owned by GOVONI (via another corporate entity he founded and controlled) and WITECK that specialized in providing tax and accounting services to trustees. Since FTAS's founding in 2017, WITECK served as the firm's principal agent. As a part of the fraud conspiracy, FTAS served as a vehicle to funnel CSNT client-beneficiaries' money to GOVONI and WITECK for their personal enrichment, including real estate purchases by WITECK.

      e.     *BroadLeaf Properties, LLC* ("BroadLeaf") was a for-profit real estate holding company that received CSNT funds. GOVONI and co-conspirators

used BroadLeaf to purchase residential properties, including many for GOVONI's personal enrichment and that of others, not as investments for the benefit of CSNT client-beneficiaries.

f.    *BCL Aviation, LLC* ("BCL Aviation") was a for-profit aviation industry holding company under the control of the co-conspirators that received CSNT funds. BCL Aviation held and operated, among other assets, at least one private jet, which GOVONI and others used for their own personal benefit.

g.    *Big Storm Brewery, LLC* ("Big Storm Brewery") was a craft brewery and distillery that received CSNT funds, which Big Storm Brewery used to pay operating and expansion costs, including payroll to its employees, without generating net positive investment returns for CSNT client-beneficiaries.

h.    *Boston Holding Company, LLC* ("BHC") was a GOVONI-founded and GOVONI-controlled holding company that served as the parent company or owner of approximately 29 other GOVONI-controlled companies, including BAM, BFG, Austin Colby, FTAS, BroadLeaf, and Big Storm Brewery.[1] GOVONI served as the President of BHC, and WITECK served on its Senior Advisory Team. BHC received CSNT funds, which it used to pay overhead and operating costs, including payroll payments to GOVONI and other employees.

---

[1] BAM, BFG, and Global Litigation Consultants, LLC ("GLC") all reported the same address in Clearwater, Florida (Pinellas County), which is within the Middle District of Florida, for their principal offices. Austin Colby, BroadLeaf, and Big Storm Brewery shared a second Clearwater, Florida address for their principal offices.

      i.    *Global Litigation Consultants, LLC* ("GLC") was a GOVONI-founded and GOVONI-controlled for-profit company that negotiated liens and medical expenses for clients who received personal injury settlements, in exchange for a fee. GLC also received funds derived from CSNT during the fraudulent scheme.

### E. The Conspiracy

24.    Beginning on an unknown date, but at least by in or about June 1, 2009, and continuing through and including in or around May 2025, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to commit certain offenses, that is:

    a.    Mail fraud, in violation of 18 U.S.C. § 1341; and

    b.    Wire fraud, in violation of 18 U.S.C. § 1343.

### F. Manner and Means

25.    The manner and means used to accomplish the objects of the conspiracy included, among others, the following:

    a.    It was a part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did unlawfully devise and execute a scheme and artifice to (1) defraud CSNT and CSNT's client-

beneficiaries out of at least $100 million by means of materially false and fraudulent pretenses, representations, and promises and material omissions; and (2) conceal their illegal activities.

b.     It was a further part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did use and cause to be used interstate wire communications and transactions to further their scheme and artifice.

c.     It was a further part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did use and cause to be used the United States Mail to further their scheme and artifice.

d.     It was a further part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did recruit new CSNT client-beneficiaries to open SNTs with CSNT, fund those trusts, and allow CSNT to manage their assets by falsely and fraudulently promising, in part, that CSNT would invest client-beneficiaries' money—in accordance with CSNT's fiduciary duty—conservatively and in ways that were designed to increase the client-beneficiaries' funds.

e.     It was a further part of the conspiracy that on or about June 1, 2009, GOVONI and others known and unknown to the Grand Jury would and did cause a purported $2.5 million "loan" to be paid to BFG, a GOVONI-controlled company, via checks and electronic funds transfers from pooled CSNT client-

beneficiaries' accounts.

   f. It was a further part of the conspiracy that GOVONI and others known and unknown to the Grand Jury would and did falsely and fraudulently represent that the "loan" was an investment in BFG, that BFG in turn was investing the money solely in opportunities that were designed to grow the CSNT client-beneficiaries' assets, and that BFG would make interest payments on the loan, when, as the conspirators knew, the money was not being invested for the ultimate benefit of the CSNT client-beneficiaries and only minimal and intermittent interest payments were made.

   g. It was a further part of the conspiracy that GOVONI and others known and unknown to the Grand Jury would and did cause the purported "loan" from pooled CSNT client-beneficiaries' accounts to BFG to be increased on four separate occasions via checks and electronic funds transfers: (1) in or around December 2009 from $2.5 million to $15 million; (2) in or around March 2010 from $15 million to $30 million; (3) in or around March 2011 from $30 million to $50 million; and finally (4) in or around January 2012 from $50 million to $100 million.

   h. It was a further part of the conspiracy that in each instance, GOVONI and others known and unknown to the Grand Jury would and did falsely and fraudulently represent that the "loan" increases were further investments in BFG, which in turn was investing the money solely in opportunities that were designed to grow the CSNT client-beneficiaries' assets.

i.    It was a further part of the conspiracy that, per GOVONI's and conspirators' direction, for any SNT account that contained "excess" cash (*i.e.,* multiple months' worth of a client-beneficiary's regular expenses), CSNT would and did distribute some portion of those "excess" client-beneficiary funds to BAM with a larger portion usually going to BFG.

j.    It was a further part of the conspiracy that BFG, which was controlled by GOVONI and others known and unknown to the Grand Jury, would not and did not invest the CSNT client-beneficiaries' money in ways that actually grew the money. Instead of investing funds received from CSNT client-beneficiaries, BFG often would and did distribute these funds via checks and electronic funds transfers to GOVONI and entities controlled by GOVONI, WITECK, and others known and unknown to the Grand Jury, for the personal enrichment of the defendants and others.

k.    It was a further part of the conspiracy that GOVONI would and did use money he fraudulently obtained from CSNT client-beneficiaries to purchase real estate (including via BroadLeaf), pay debts, travel via private jet (using BCL Aviation), fund another for-profit business (Big Storm Brewing), and make deposits into his personal bank accounts.

l.    It was a further part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did mail and cause to be mailed communications and documents to further their scheme

and artifice. For example, the defendants would and did mail and cause to be mailed annual statements to CSNT client-beneficiaries that falsely and fraudulently represented that the beneficiaries' money was in their accounts for use, when, in truth and in fact—as GOVONI, WITECK, and others knew—much of the client-beneficiaries' SNT funding had been "loaned" to BFG (and distributed to the defendants and others) and was thus missing from the client-beneficiaries' accounts.

m.    It was a further part of the conspiracy that, per GOVONI's direction, CSNT employees would and did create false and fraudulent internal accounting records, which included false and fraudulent entries designating money "loaned" to BFG as invested in "BFG Prime" and/or "Bank56."

n.    It was a further part of the conspiracy that in order to conceal the fraudulent scheme and artifice and maintain the appearance of smooth operations, CSNT employees, per GOVONI's direction, would and did cover shortfalls in existing client-beneficiaries' trusts by using money deposited into new client-beneficiaries' SNTs to pay for reimbursable expenses when funds had been depleted and/or misappropriated to other GOVONI-controlled entities.

o.    It was a further part of the conspiracy that BFG would not and did not repay CSNT for the "loan" when it became due, but instead GOVONI and WITECK, with the assistance of others known and unknown to the Grand Jury, would and did attempt to conceal the fraudulent nature of the "loan" to BFG by

making minimal and intermittent interest payments, which were significantly lower than the payments required by the loan documents.

   p. It was a further part of the conspiracy that in order to conceal the conspiracy, GOVONI would and did cause CSNT-derived and BFG-derived money in his personal bank accounts to be moved to other accounts, including some of which the conspirators withdrew in cash.

   q. It was a further part of the conspiracy that GOVONI would and did make false statements in the bankruptcy proceedings, in further concealment of the conspiracy.

   r. It was a further part of the conspiracy that GOVONI would and did make false statements in a financial declaration and under oath in connection with the CSNT bankruptcy proceedings in order to further his concealment of the fraud.

   s. It was a further part of the conspiracy that GOVONI, WITECK, and others known and unknown to the Grand Jury would and did perform acts and make statements to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the scheme and artifice and the acts committed in furtherance of the scheme and artifice.

   In violation of 18 U.S.C. § 1349.

## COUNTS TWO THROUGH FIVE
### (Mail Fraud)

### A. **Introduction**

26.      The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of Count One of this Indictment as if fully set forth herein and further alleges that:

### B. **The Scheme and Artifice**

27.      Beginning on an unknown date, but no later than on or about June 1, 2009, and continuing through no later than in or around May 2025, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

did knowingly and intentionally devise, and attempt to devise, a scheme and artifice to defraud, and to obtain and attempt to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### C. **Manner and Means**

28.      The Grand Jury hereby realleges and incorporates by reference paragraph 25 of Count One of this Indictment as if fully set forth herein.

### D. **Mailings to Execute the Scheme and Artifice**

29.      On or about the dates listed below, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

16

for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly, and with intent to defraud, place in any post office and authorized depository for mail a matter to be sent and delivered by the United States Postal Service, and did knowingly cause to be delivered by mail and private and commercial interstate carrier, according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, the following items:

| COUNT | STATEMENT DATE | DESCRIPTION OF MAILING |
|-------|---------------|------------------------|
| TWO | April 5, 2023 | CSNT Account Statement for the Trust Account of Victim-1 for the period of January 1, 2022, through December 31, 2022 |
| THREE | July 20, 2023 | CSNT Account Statement for the Trust Account of Victim-2 for the period of July 1, 2022, through June 30, 2023 |
| FOUR | December 7, 2023 | CSNT Account Statement for the Trust Account of Victim-3 for the period of November 1, 2022, through October 31, 2023 |
| FIVE | January 24, 2024 | CSNT Account Statement for the Trust Account of Victim-4 for the period of January 1, 2022, through December 31, 2022 |

In violation of 18 U.S.C. § 1341.

## COUNTS SIX THROUGH ELEVEN
### (Wire Fraud)

### A. Introduction

30.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of Count One of this Indictment as if fully set forth herein and further alleges that:

### B. The Scheme and Artifice

31.     Beginning on an unknown date, but no later than on or about June 1, 2009, and continuing through in or around May 2025, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

did knowingly and intentionally devise, and attempt to devise, a scheme and artifice to defraud, and to obtain and attempt to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### C. Manner and Means

32.     The Grand Jury realleges and incorporates by reference the allegations contained in paragraph 25 of Count One of this Indictment as if fully set forth herein.

### D. Wires to Execute the Scheme and Artifice

33.     On or about the dates set forth below, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

for the purpose of executing the aforesaid scheme and artifice, knowingly and

intentionally transmitted and caused to be transmitted by means of wire

communication in interstate and foreign commerce, the writings, signs, signals,

pictures, and sounds, as described below:

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION OR TRANSACTION |
|---|---|---|
| SIX | July 24, 2020 | Electronic funds transfer of $19,841.20 via wire communications from a BFG bank account at Financial Institution-1 to a GLC bank account at Financial Institution-1 for "PR Funding" |
| SEVEN | August 7, 2020 | Electronic funds transfer of $36,397.17 via wire communications from a BFG bank account at Financial Institution-1 to an Austin Colby bank account at Financial Institution-1 for "PR Funding" |
| EIGHT | August 7, 2020 | Electronic funds transfer of $14,912.60 via wire communications from a BFG bank account at Financial Institution-1 to a BHC bank account at Financial Institution-1 for "PR Funding" |
| NINE | August 21, 2020 | Electronic funds transfer of $54,948.42 via wire communications from a BFG bank account at Financial Institution-1 to a GLC bank account at Financial Institution-1 for "PR Funding" |
| TEN | August 21, 2020 | Electronic funds transfer of $13,151.75 via wire communications from a BFG bank account at Financial Institution-1 to a BroadLeaf Properties bank account at Financial Institution-1 for "AP Funding" |
| ELEVEN | September 4, 2020 | Electronic funds transfer of $57,285.34 via wire communications from a BFG bank account at Financial Institution-1 to an Austin Colby bank account at Financial Institution-1 for "PR Funding" |

In violation of 18 U.S.C. § 1343.

## COUNT TWELVE
### (Money Laundering Conspiracy)

### A. **Introduction**

34.    The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of Count One of this Indictment as if fully set forth herein and further alleges that:

### B. **The Conspiracy**

35.    Beginning on an unknown date, but no later than on or about June 1, 2009, and continuing through in or around May 2025, in the Middle District of Florida, and elsewhere, the defendants,

LEO JOSEPH GOVONI and
JOHN LEO WITECK,

did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to commit money laundering offenses against the United States, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### C. **Object of the Conspiracy**

36.    It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is

mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, with the intent to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, all in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### D. **Manner and Means**

37.    It was part of the conspiracy that conspirators would and did cause funds that constituted proceeds of specified unlawful activity to be transferred from one entity to another by first transferring the proceeds into "pass-through entities" before a second transaction occurred, of the same or substantially similar amount, directing the proceeds into the third entity, all to conceal the location, source, ownership, or control of those funds.

38.    It was further part of the conspiracy that conspirators would and did use circular transactions between corporate entities they controlled to conceal the nature and source of funds.

### E. **Acts and Transactions**

39.    In furtherance of the money laundering conspiracy and to effectuate the object thereof, the defendants committed the following acts, among others, within the Middle District of Florida and elsewhere:

*May 6, 2020 – May 11, 2020*

a.    On or about May 6, 2020, conspirators caused approximately $143,565 of CSNT-derived wire and mail fraud proceeds in a Financial Institution-

3 bank account ending in 8458 belonging to FTAS to be transferred via wire to a

Financial Institution-1 account ending in 0013 belonging to BFG. The day before

this transfer, the BFG account had a total balance of only approximately $96,114.

      b.     Approximately five days later, on or about May 11, 2020,

conspirators caused this newly arrived approximately $143,565 to pass through

BFG's account and be returned back to CSNT via check, with "Interest Payment"

written on the memo line.

*January 7, 2021 – January 8, 2021*

      c.     On or about January 7, 2021, conspirators caused

approximately $113,000 of CSNT-derived wire and mail fraud proceeds in a

Financial Institution-3 bank account ending in 8458 belonging to FTAS to be

transferred via check to a Financial Institution-1 account ending in 0013 belonging

to BFG. The day before this check posted, the BFG account had a total balance of

only approximately $19,462.

      d.     The next day, on or about January 8, 2021, conspirators caused

approximately $112,993 of these newly arrived funds to pass through BFG's

account and be returned back to CSNT via check, with "Interest Payment" written

on the memo line.

*July 14, 2021 – July 20, 2021*

      e.     On or about July 14, 2021, conspirators caused approximately

$145,000 of CSNT-derived wire and mail fraud proceeds to be transferred via check

from FTAS' Financial Institution-3 bank account ending in 8458 to a Financial Institution-1 ending in 0013 belonging to BFG. The day before this check posted, the BFG account had a total balance of only approximately $69,962.

       f.    Approximately a week later, on or about July 20, 2021, conspirators caused approximately $143,215 of these newly arrived funds to pass through BFG's account and be returned back to CSNT via check, with "Interest Payment" written on the memo line.

*BCL Aviation*

       g.    From no later than in or about May 2019 through at least in or about April 2022, conspirators caused a series of circular transactions to occur between two GOVONI-controlled corporate entities, BFG and BCL Aviation. The circular transactions involved CSNT-derived wire and mail fraud proceeds and included but were not limited to the following:

       1)    On or about May 8, 2019, conspirators caused approximately $50,000 of CSNT-derived wire and mail fraud proceeds to be transferred by wire from a Financial Institution-1 account ending in 1472 belonging to BCL Aviation to a Financial Institution-1 account ending in 0013 belonging to BFG.

       2)    On or about the same day, May 8, 2019, conspirators caused approximately $50,000 to be transferred by wire from the Financial

Institution-1 account ending in 0013 belonging to BFG *back* to the Financial

Institution-1 account ending in 1472 belonging to BCL Aviation.

       3)     On or about October 4, 2019, conspirators caused

approximately $50,000 of CSNT-derived wire and mail fraud proceeds to be

transferred by wire from a Financial Institution-1 account ending in 1472 belonging

to BCL Aviation to a Financial Institution-1 account belonging to BFG ending in

0013.

       4)     On or about the same day, October 4, 2019, conspirators

caused approximately $50,000 to be transferred by wire from the Financial

Institution-1 account ending in 0013 belonging to BFG *back* to the Financial

Institution-1 account ending in 1472 belonging to BCL Aviation.

       5)     On or about April 3, 2020, conspirators caused

approximately $50,000 of CSNT-derived wire and mail fraud proceeds to be

transferred by wire from a Financial Institution-1 account ending in 1472 belonging

to BCL Aviation to a Financial Institution-1 account ending in 0013 belonging to

BFG.

       6)     On or about the same day, April 3, 2020, conspirators

caused approximately $50,000 to be transferred by wire from the Financial

Institution-1 account ending in 0013 belonging to BFG *back* to the Financial

Institution-1 account ending in 1472 belonging to BCL Aviation.

7)    On or about April 15, 2022, conspirators caused approximately $100,000 of CSNT-derived wire and mail fraud proceeds to be transferred by two wires of $50,000 each from a Financial Institution-1 account ending in 1472 belonging to BCL Aviation to a Financial Institution-1 account ending in 0013 belonging to BFG.

8)    On or about the same day, April 15, 2022, conspirators caused approximately $100,000 to be transferred by wire from the Financial Institution-1 account ending in 0013 belonging to BFG *back* to the Financial Institution-1 account ending in 1472 belonging to BCL Aviation.

In violation of 18 U.S.C. § 1956(h).

## COUNT THIRTEEN
### (Bank Fraud)

### A. Introduction

40.    The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of Count One of this Indictment as if fully set forth herein and further alleges that:

41.    Beginning at least as early as in or around December 2021, and continuing through at least in or around January 2022, in the Middle District of Florida, and elsewhere, the defendant,

LEO JOSEPH GOVONI,

did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud federally insured financial institutions, the deposits of which

25

were then insured by the FDIC, and to obtain, by means of materially false and

fraudulent pretenses, representations, and promises, and by omission of material

facts, certain moneys, funds, credits, assets, and other property owned by and

under the custody and control of Financial Institution-2.

## B. Manner and Means

42.    The manner and means by which defendant GOVONI sought to

accomplish the scheme and artifice included the following:

a.    It was a part of the scheme and artifice that GOVONI, acting

on behalf of Artspace Properties, LLC as owner, applied for a loan from Financial

Institution-2 in the amount of $3,690,082.

b.    It was a further part of the scheme and artifice that GOVONI

falsely represented to Financial Institution-2 that he intended to and would use

$972,310 of the funds to be disbursed in excess of the payoff of the existing

mortgage for "RE improvements advanced at closing," where "RE" referred to

specific pieces of real estate belonging to Artspace Properties, LLC, which was

material to Financial Institiution-2's transfer of funds given that this submission

appeared to be facially valid.

## C. Execution of the Scheme

43.    On or about December 21, 2021, the defendant,

LEO JOSEPH GOVONI,

knowingly and intentionally executed and attempted to execute the aforesaid

scheme and artifice by submitting a signed term sheet for a loan application on behalf of Artspace Properties, LLC containing materially false representations, promises, and omissions to Financial Institution-2, to obtain a mortgage refinance loan in the amount of $3,690,082.

In violation of 18 U.S.C. § 1344.

## COUNT FOURTEEN
### (Illegal Monetary Transactions)

44.    The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of Count One of this Indictment and paragraphs 40 through 42 of Count Thirteen of this Indictment as if fully set forth herein and further alleges that:

45.    On or about January 26, 2022, the defendant,

LEO JOSEPH GOVONI,

did knowingly engage and attempt to engage in a monetary transaction in and affecting interstate and foreign commerce in criminally-derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, bank fraud, in violation of 18 U.S.C. § 1344, in that the defendant knowingly engaged and attempted to engage in the transfer of approximately $205,054 of proceeds via check to Financial Institution-4 to pay off a home equity line of credit on his personal residence in Clearwater, Florida.

In violation of 18 U.S.C. §§ 1957 and 2.

## COUNT FIFTEEN
### (False Bankruptcy Declaration)

46.    The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of Count One of this Indictment as if fully set forth herein and further alleges that:

47.    In or around April 2025, in the Middle District of Florida, in or in relation to cases filed under Title 11 of the United States Code in the United Bankruptcy Court for the Middle District of Florida, namely Case No. 8:24-bk-00676-RCT and Adv. Pro. 8:24-ap-00139-RCT, the defendant,

LEO JOSEPH GOVONI,

did knowingly and fraudulently make a materially false declaration, certificate, and verification under penalty of perjury, by submitting and causing to be submitted a Statement of Fact Information Sheet stating that his only account or investment was a "retirement account" when in fact, as the defendant knew, he had multiple other personal accounts, investments, and business ownership interests, including, but not limited to the business ownership interests described in paragraph 23 of Count One of this Indictment.

In violation of 18 U.S.C. § 152(3).

## FORFEITURE

1.    The allegations contained in Counts One through Fifteen of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28

U.S.C. § 2461(c), 18 U.S.C. § 982(a)(1), and 18 U.S.C. § 982(a)(2)(A).

2.      Upon conviction of a violation of 18 U.S.C. §§ 1349, 1341, and/or 1343, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3.      Upon conviction of a violation of 18 U.S.C. § 1344, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

4.      Upon conviction of a violation of 18 U.S.C. §§ 1956(h) and/or 1957, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

5.      Upon conviction of a violation of 18 U.S.C. § 152, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

6.      The property to be forfeited includes, but is not limited to, the following: an order of forfeiture in the approximate amount of at least $88,065,957, which represents the amount of proceeds the defendants personally obtained from the commission of the offenses, and an order of forfeiture equal to the value of any

property, real or personal, involved in the 18 U.S.C. § 1956(h) and 18 U.S.C. § 1957 violations, and the following assets:

      a.      13851 Lake Point Dr., Clearwater, FL 33762;

      b.      2637 Westview Ct., Clearwater, FL 33761;

      c.      3256 Adrian Ave., Largo, FL 33774;

      d.      3258 Adrian Ave., Largo, FL 33774;

      e.      725 2nd Ave. NE, Largo, FL 33770;

      f.      12707 49th St. N., Clearwater FL 33762;

      g.      610 Charlotte St., Punta Gorda, FL 33950;

      h.      2950 Meadow Hill Dr., Clearwater, FL 33761;

      i.      14053 Feather Sound Dr., Clearwater, FL 33762;

      j.      14109 Spoonbill Lane, Clearwater, FL 33762;

      k.      2612 Heron Lane N, Clearwater, FL 33762;

      l.      323 W. Broadway, #10E, Louisville, KY 40202; and

      m.      3435-3511 Sullivant Ave., Columbus, OH 43204.

7.      If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

A TRUE BILL 

_____

Foreperson

GREGORY W. KEHOE
United States Attorney

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division

By:    _____
Jennifer L. Peresie
Assistant United States Attorney

By:    _____
Michael M. Gordon
Assistant United States Attorney

By:    _____
Carlton C. Gammons
Assistant United States Attorney
Chief, Economic Crimes Section

By:    _____
Lyndie M. Freeman
Trial Attorney, Fraud Section
Criminal Division

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
## Tampa Division

### THE UNITED STATES OF AMERICA

vs.

### LEO JOSEPH GOVONI and
### JOHN LEO WITECK

### INDICTMENT

Violations: 18 U.S.C. §§ 1349, 1341, 1343, 1344,1956 (h), 1957, 152(3)

A true bill,



Foreperson

Filed in open court this <u>18th</u> day

of June 2025.

_____
Clerk

Bail $_____